Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **LILAC DEVELOPMENT GROUP, LLC,**<br><br>    **Plaintiff,**<br><br>    v.<br><br>**HESS CORPORATION,** *et al.***,**<br><br>    **Defendants.** | Civil Action No.: 15-7547 (ES) (CLW)<br><br>OPINION |

**SALAS, DISTRICT JUDGE**

Before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (D.E. Nos. 65 & 67). Plaintiff Lilac Development Group LLC moves for partial summary judgment on its breach of contract claim, and Defendants Speedway LLC and Hess Corporation move for summary judgment on Lilac's claims for breach of contract and breach of the covenant of good faith and fair dealing. Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). As set forth below, the Court GRANTS Plaintiff's motion and GRANTS IN PART and DENIES IN PART Defendants' motion.

**I.  BACKGROUND**[1]

Lilac owns commercial property located at 1139-1153 Broad Street, Newark, New Jersey (the "Property"). (Lilac SUMF ¶ 1). On October 31, 2013, Lilac entered into an agreement with

---

[1] The relevant background facts are pulled from the parties' statements of undisputed material fact. (D.E. No. 65. ("Defs. SUMF"); D.E. No. 67-1 ("Lilac SUMF")). After reviewing the parties' responses to those statements (D.E. Nos. 70-1 & 71), the Court has extracted facts which are undisputed, or has noted relevant disputes.

1

Hess for the lease of the Property. (*Id.* ¶ 6; D.E. No. 65-1, Speedway Exhibit 1 ("Lease Agreement")). Both parties had legal counsel review the Lease Agreement prior to signing it. (Defs. SUMF ¶¶ 10–11).

Hess had standard size stores and utilized modular, pre-fabricated construction. (*Id.* ¶ 20). Based on the size and shape of the Property, Hess decided to install a 1,660-square-foot convenience store on the Property along with six fuel dispensers with twelve fueling positions and two underground storage tanks. (*Id.* ¶ 19). Although Hess had larger modular store configurations, "[a] store larger than 1660 sq[uare] f[ee]t on a property of this size and shape would have been contrary to Hess' business plan for the design of its modular stores, as well as Hess' design practices for its convenience stores." (*Id.* ¶ 21).

On January 23, 2014, Hess applied for a final site plan with the Newark Board of Adjustment, seeking a permit to build the 1,660-square-foot Hess Express convenient store. (*Id.* ¶ 22; Lilac SUMF ¶ 15). On March 7, 2014, the board rejected Hess's application because a restriction in the deed prevented a gas station from being built on the Property. (Defs. SUMF ¶ 23; Lilac SUMF ¶ 4). There were follow-up meetings and written communications to discuss removing the restriction. (Lilac SUMF ¶ 17).[2]

Meanwhile, on September 30, 2014, Speedway acquired the convenience store division of Hess, which was a wholly owned subsidiary of Hess then known as Hess Retail Holdings, LLC ("Hess Retail"). (Defs. SUMF ¶ 24). Through the acquisition, Speedway acquired everything in Hess Retail's portfolio, including approximately 1,250 convenience stores and various leases. (*Id.*

---

[2] Lilac suggests that both Lilac and Hess were involved in these follow-up discussions with the city of Newark (Lilac SUMF ¶ 17), but Defendants dispute that representatives from Hess participated in any of the meetings. (D.E. No. 71 ¶ 17).

¶ 26). Speedway had to accept the entire portfolio and could not reject any store or lease. (*Id.* ¶ 27). The acquired portfolio included the Lease Agreement. (*Id.* ¶ 26).

Speedway did not review the Lease Agreement before the acquisition. (*Id.* 28; Lilac SUMF ¶ 25). After the acquisition, Speedway asked those employees who were brought over from Hess[3] to continue working on ongoing projects until Speedway had a chance to review each active project. (Defs. SUMF ¶ 28; Lilac SUMF ¶ 29). Those employees continued working on the application to remove the deed restriction on the Property, at least for some time after the acquisition. (Lilac SUMF ¶ 30).

On December 4, 2014, the Newark Planning Board passed a resolution that removed the deed restriction and allowed for the sale of gasoline on the Property. (Defs. SUMF ¶ 29). In January 2015, Speedway resubmitted to the Newark Planning Board an application for approval of a 1,660-square-foot Hess Express convenience store with 16 fueling positions. (*Id.* ¶ 30; Lilac SUMF ¶ 31). In a letter dated February 3, 2015, the Planning Board provided a list of items that needed to be addressed in order for the application to be deemed complete. (Defs. SUMF ¶ 31; D.E. No. 70-1 ¶ 31; D.E. No. 65-10, Speedway Exhibit 16). Although the Planning Board scheduled a hearing on the application for some time in March (the parties dispute the exact date), the hearing never occurred. (Lilac SUMF ¶ 33; D.E. No. 71 ¶ 33). Instead, Speedway cancelled

---

[3] Lilac refers to these employees as "Hess employees," and Defendants take issue with that characterization because they became Speedway employees after the acquisition. (Lilac SUMF ¶ 30; D.E. No. 71 ¶ 30). Defendants also take issue with Lilac's reference to "Hess/Speedway" as the post-acquisition entity. Defendants specify that the legal entity was Hess Retail Stores LLC, which was a wholly owned subsidiary of Speedway. (Lilac SUMF ¶ 32; D.E. No. 71 ¶ 32). These are non-material disputes.

3

the hearing, put the application on hold subject to further review, and never pursued the application. (Defs. SUMF ¶ 32; Lilac SUMF ¶¶ 35–37).

By letter dated April 20, 2015, Speedway informed Lilac that it was terminating the Lease Agreement. (Lilac SUMF ¶¶ 38–39). According to Defendants, since 2008, Speedway has had a policy of building stores which were either 3,900 square feet or 4,600 square feet. (Defs. SUMF ¶ 33 (disputed)). Thus, in terminating the Lease Agreement, Speedway explained to Lilac that that size of the Property would not allow it to build its standard 3,900-square-foot convenience store and fuel dispensing operation. (Lilac SUMF ¶ 40). As for any smaller store, Speedway performed an economic analysis of the return on investment and determined that it was a negative return, which did not meet the economic requirements Speedway had for building a new store. (*Id.* ¶ 40; Defs. SUMF ¶ 36). Speedway believes that the termination was within its rights under the Lease Agreement.

On September 11, 2015, Lilac commenced this action in state court alleging claims for breach of contract, breach of the duty of good faith and fair dealing, and promissory estoppel. (D.E. No. 1-2, Complaint ¶¶ 57–69). On October 16, 2015, Defendants removed the case to this Court based on diversity jurisdiction. (D.E. No. 1, Notice of Removal). Thereafter, Defendants filed an answer and counterclaim against Lilac, seeking a declaratory judgment that, *inter alia*, Speedway properly terminated the Lease Agreement. (D.E. No. 7). On June 7, 2016, the late Judge William H. Walls granted Lilac's motion to dismiss the counterclaim because it was subsumed by Lilac's claim for breach of contract. (D.E. No. 25 at 1). The parties engaged in discovery, and on July 26, 2019, this case was reassigned to the Undersigned. (D.E. No. 59).

4

Shortly thereafter, the parties filed the pending cross-motions for summary judgment. (D.E. Nos. 65 & 67).[4]

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when—in viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant—a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that no genuine issue of facts exists. *Aman v. Cort Furniture Rental Cop.*, 85 F.3d 1074, 1080 (3d Cir. 1996). This burden is satisfied by "produc[ing] evidence showing the absence of a genuine issue of material fact" or, if the nonmovant bears the burden of proof at trial, by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F.

---

[4] The motions were administratively terminated pending settlement discussions, and they were reinstated when settlement discussions proved unsuccessful. (D.E. Nos. 88, 91 & 94).

App'x 353, 354 (3d Cir. 2002) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).  In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.

### III. ANALYSIS

#### A. Breach of Contract

The parties dispute whether Speedway's termination of the Lease Agreement constitutes a breach of the same.  Both sides rely on paragraph 6 of the Lease Agreement, which provides the following:

> 6. Governmental Authorizations.
>
> (a) Upon execution hereof, Tenant will apply to the appropriate governmental authorities, and thereafter prosecute such applications promptly and using commercially reasonable efforts to a final determination, for variances, zoning ordinance amendments, special exceptions, licenses, permits and any other administrative actions (herein collectively called "Governmental Authorizations") as may be necessary to demolish existing improvements on the Premises, and to construct and complete on the Premises a self-service/full service gasoline station and convenience store with co-branded fast food (the "Station") in accordance with Tenant's plans and specifications, as the plans and specifications may, at Tenant's sole discretion be changed or modified, and to permit Tenant, without limit as to time, lawfully to operate and maintain the Station and to use the Premises for such purposes.  The Authorizations will include, as may be required, all necessary governmental authority and permission to install at the Premises appropriate underground motor fuel storage tanks, fuel oil tanks, waste oil tanks, lighting, canopy, façade, signs, curb or highway cuts and other similar improvements.  The cost of obtaining Governmental Authorizations will be borne by Tenant.
>
> (b) If within eighteen (18) months from the date hereof (the "Permit Period"), (i) all Governmental Authorizations as required in Paragraph 6(a) have not been obtained or are not currently in effect, (ii) Tenant determines at any time that Governmental Authorizations will not be obtainable or can only be obtained at a cost which Tenant determines to be too high, or that

> development costs for the Station will be materially higher than Tenant had anticipated, Lessor (only as to Paragraph 6(b)(i)), or Tenant, will have the right, exercisable at any time thereafter, but prior to receipt of all Governmental Authorizations by Tenant, to terminate this Agreement, and neither Lessor nor Tenant will have any further liability to the other. Tenant will not be obligated to appeal any adverse determination.

(Lease Agreement ¶ 6). Defendants argue that pursuant to paragraph 6(b), there are two ways a party can terminate the Lease Agreement. (D.E. No. 66 ("Defs. Mov. Br.") at 12). First, according to Defendants, paragraph 6(b)(i) unambiguously allows either party to terminate the Lease Agreement within the Permit Period, so long as the Governmental Authorizations are either not obtained or not in effect. (*Id.* at 4 & 12–13). Second, says Defendants, Tenant (Speedway) could terminate the Lease Agreement pursuant to paragraph 6(b)(ii) if, *inter alia*, "development costs for the station will be materially higher than [Speedway] anticipated." (*Id.* at 13 (quoting the Lease Agreement)). And according to Defendants, Speedway permissibly terminated the Lease Agreement under either provision because the "Governmental Authorizations had not been obtained nor were they in effect and Speedway also determined that the development costs for constructing the Station were higher than Speedway anticipated in that the return on investment did not meet Speedway's standards for operating a store." (*Id.* at 14).

Although Lilac agrees that paragraph 6(b) enumerates two circumstances in which Speedway could terminate the Lease Agreement within the Permit Period, it argues that neither circumstance was present here. (D.E. No. 67 ("Lilac Mov. Br.") at 9).[5] Specifically, Lilac points out that paragraph 6(b)(i) allows termination if the "'Government Authorizations *as required in Paragraph 6(a)* have not been obtained or are not currently in effect.'" (*Id.* (quoting the Lease Agreement and adding emphasis)). And "[s]ince 6(a) requires prosecution of all applications for

---

[5] Neither side reads paragraph 6(b) to require that Tenant satisfy both (i) and (ii) before terminating.

7

Governmental Authorization to a final determination, Speedway could not terminate the Lease pursuant to 6(b)(i) unless it prosecuted the application to a final determination." (*Id.*). Because Speedway did not prosecute its application to final determination, Lilac says Speedway could not invoke paragraph 6(b)(i). (*Id.*). As for paragraph 6(b)(ii), Lilac argues that Speedway "conflates the distinct concepts of 'development costs' and 'return on investment.'" (D.E. No. 70 ("Lilac Opp. Br.") at 7). Specifically, Lilac says that Speedway did not terminate the Lease Agreement because the development costs (*i.e.*, "the price to build the store") were materially higher than expected, but because the estimated return on investment (*i.e.*, the "amount earned per year on an investment") revealed the store could not be profitable enough. (*Id.* at 6–9 (quoting *Black's Law Dictionary* (6th ed. 1990)); Lilac Mov. Br. at 11). Thus, according to Lilac, Speedway was not permitted to terminate the Lease Agreement under either paragraph 6(b)(i) or 6(b)(ii).

Because the Court's jurisdiction is based on diversity, the Court applies the substantive law of the state of New Jersey. "Generally, the terms of an agreement are to be given their plain and ordinary meaning." *M.J. Paquet, Inc. v. New Jersey Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002). If the language of the contract is clear, the Court must enforce it as written. *CSFB 2001–CP–4 Princeton Park Corp. Ctr., LLC v. SB Rental I, LLC*, 980 A.2d 1, 4 (N.J. Super. Ct. App. Div. 2009). The Court cannot rewrite the parties' agreement by substituting a new or different provision from what is clearly written in the contract. *E. Brunswick Sewerage Auth. v. E. Mill Assocs., Inc.,* 838 A.2d 494, 497 (N.J. Super. Ct. App. Div. 2004). However, "'[e]ven in the interpretation of an unambiguous contract, [the Court] may consider all of the relevant evidence that will assist in determining its intent and meaning.'" *Fed Cetera, LLC v. Nat'l Credit Servs.,*

8

*Inc.*, 938 F.3d 466, 469–70 (3d Cir. 2019) (quoting *Manahawkin Convalescent v. O'Neill*, 85 A.3d 947, 958–59 (N.J. 2014)).

If a contract is capable of being interpreted in more than one way, then it is ambiguous. "In deciding whether a contract is ambiguous, a court must hear the parties' interpretation of the contract and determine if there is any indication that the terms of the contract are susceptible to different meanings." *INDECS Corp. v. Claim DOC, LLC*, No. 16-4421, 2020 WL 5868796, at *9 (D.N.J. Oct. 2, 2020). Whether a contract is ambiguous is a legal question for the Court. *Id.* To make a finding of ambiguity, the Court may consider the contract language, the meanings suggested by counsel, and any extrinsic evidence offered in support of each interpretation. *Id.* "[W]here there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury." *Great Atl. & Pac. Tea Co. v. Checchio*, 762 A.2d 1057, 1061 (N.J. Super. Ct. App. Div. 2000).

### i. Termination Pursuant to Paragraph 6(b)(i)

Speedway claims that pursuant to paragraph 6(b)(i), anyone can terminate the Lease Agreement during the Permit Period for any reason so long as the Governmental Authorizations are not obtained or in effect, and without other qualification. (Defs. Mov. Br. at 12–13). Lilac contends that the right to terminate under 6(b)(i) is conditioned on paragraph 6(a), which requires Tenant to prosecute all Government Authorizations to final determination. (Lilac Mov. Br. at 9). Reading paragraph 6 as a whole, the Court finds that paragraph 6(b)(i) is unambiguous, and that Lilac's reading is the only reasonable one.

To start, the Court considers the meaning of the phrase "as required in Paragraph 6(a)" in paragraph 6(b)(i). Lilac's position—that the phrase is designed to condition paragraph 6(b)(i) on

9

the requirement in paragraph 6(a) that Government Authorizations be pursued to final determination—is consistent with a plain reading of the provision. (Lilac Mov. Br. at 9). Indeed, paragraph 6(a) requires that upon execution of the Lease Agreement, Tenant shall "apply to the appropriate governmental authorities, and thereafter prosecute such applications promptly and using commercially reasonable efforts to a final determination," for any Government Authorizations "as may be necessary to demolish existing improvements on the Premises, and to construct and complete on the Premises a self-service/full service gasoline station and convenience store with co-branded fast food (the "Station") in accordance with Tenant's plans and specifications," and "to operate and maintain the Station and to use the Premises for such purposes." (Lease Agreement ¶ 6). The parties do not dispute that certain Government Authorizations were indeed necessary in this case for Speedway to begin building a gas station on the Property. Thus, paragraph 6(a) required Speedway to prosecute such applications promptly and to a final determination using commercially reasonable efforts.

 Defendants argue that Lilac ignores the portion of paragraph 6(a) which expressly permits Speedway to change or modify its plans and specifications. And according to Defendants, Speedway's ability to modify its plans and specifications provides support for Speedway's ability to terminate the Lease Agreement if its plans changed, so long as the Government Authorizations were not yet obtained. (Defs. Opp. Br. at 5). However, as Defendants acknowledge, paragraph 6(a) does not permit Speedway to abandon plans to build the Station altogether, as it was "still obligated to construct a convenience store with fuel pumps." (*Id.* at 9). Moreover, while Speedway was free to modify the plans and specifications for the proposed store, paragraph 6(a) did not alleviate Speedway from the requirement that it apply for any necessary Government

10

Authorizations and prosecute such applications to a final determination simply because their plans changed.  Put differently, although Speedway had discretion to change or modify the plans and specifications for the Station, the new plan could not be to do nothing.  Speedway still was required to pursue any Government Authorizations to final determination as may be necessary to construct and complete the Station in accordance with those new plans.[6]  In sum, Lilac's understanding of the phrase "as required in paragraph 6(a)" is supported by the plain language of the Lease Agreement and Defendants' argument pertaining to its ability to modify or change its plans and specifications is unpersuasive.

There is an additional problem with Defendants' argument that Speedway could terminate the Lease Agreement within the Permit Period "with, or without, a reason for doing so, but prior to all Government Authorizations being obtained."  (Defs. Opp. Br. at 11).  If the Court accepts Defendants' reading that paragraph 6(b)(i) permits termination prior to receipt of Government Authorizations (and without other qualifications), then paragraph 6(b)(i) would render paragraph 6(b)(ii) superfluous.  That is because paragraph 6(b)(ii) provides specific circumstances which would permit Tenant to terminate the Lease Agreement prior to receipt of all Government Authorizations.  But if Tenant could terminate the Lease Agreement within the Permit Period and prior to receipt of all Government Authorizations for *any reason* or *without reason* under paragraph 6(b)(i), then there would be no need to allow termination for the *specific reasons* outlined in paragraph 6(b)(ii).  In other words, permissible termination under paragraph 6(b)(i) necessarily encompasses those covered under 6(b)(ii).

---

[6] Speedway may have been able to forego (*i.e.*, not pursue to final determination) previously submitted applications for Government Authorizations to the extent those applications were no longer necessary to construct, operate, and maintain the Station, as modified.  But then it would have to pursue any additional, necessary Government Authorizations to final determination.

11

Lilac's reading, on the other hand, gives paragraphs 6(b)(i) and (ii) independent meanings. That is, paragraph 6(b)(i) allows termination if Tenant prosecuted its applications for Governmental Authorizations to final determination, but the Government Authorizations were not yet obtained or in effect. On the other hand, paragraph 6(b)(ii) allows termination, even if the applications were not prosecuted to final determination. Instead, paragraph 6(b)(ii) permits termination if the Government Authorizations were not yet received and "Tenant determines at any time that Government Authorizations will not be obtainable or can only be obtained at a cost which Tenant determines to be too high, or that development costs for the Station will be materially higher than Tenant had anticipated." Thus, Lilac's interpretation avoids rendering paragraph 6(b)(ii) superfluous. *Irwin Katz & Assocs., Inc. v. Concepts in Health, Inc.*, No. 13-1217, 2014 WL 6471486, at *8 (D.N.J. Nov. 19, 2014) (collecting cases demonstrating the principle that a contract should not be given an interpretation which renders terms superfluous or meaningless); *Glenpointe Assocs., III v. Regency Sav. Bank*, No. 06-1690, 2006 WL 2786885, at *6 (D.N.J. Sept. 25, 2006) ("In making a determination concerning the clarity or ambiguity of the contract terms, the Court should avoid interpreting contractual language in a way that renders any term of the contract meaningless or superfluous.").

To rebut Lilac's reading of paragraph 6(b)(i), Defendants argue that deposition testimony makes clear that Lilac knew that the Lease Agreement contained what they refer to as a "kickout" or "escape" clause. (Defs. Mov. Br. at 15; Defs. Opp. Br. at 9–10). Specifically, Defendants explain that two Lilac officers—Manuel Rosa and Maureen Devore Rosa—acknowledged that the Lease Agreement contained a kickout clause. (Defs. Mov. Br. at 15; Defs. Opp. Br. at 10). However, neither officer testified that the Lease Agreement contained a kickout clause *that*

*allowed Speedway to terminate the Lease Agreement for any reason prior to the Governmental Authorizations being obtained or prosecuted to final determination.* (*See* D.E. No. 66-1, Speedway Exhibit 3 at 20:12–23:13, 24:15–25:21 & 114:12–115:10; D.E. No. 66-2, Speedway Exhibit 4 at 19:10–20:20). Nor did these witnesses testify that, generally speaking, a kickout clause in this or similar contexts necessarily means an option to terminate prior to Governmental Authorizations and without any other conditions attached. Indeed, case law confirms that while the term "kickout clause" generally refers to an option to terminate an agreement, termination often depends on conditions that are outlined in the parties' agreement. *See First Interstate Avon, Ltd. v. Cost Plus, Inc.*, No. 19-2079, 2020 WL 6047360, at *2 (N.D. Ohio Oct. 13, 2020) (discussing a "kickout clause" that permitted termination up to a certain date only if certain conditions were met); *Cranston/BVT Assocs., Ltd. P'ship v. Sleepy's, LLC*, No. 13-0594, 2016 WL 4660935, at *2 (D.R.I. Sept. 7, 2016) ("In commercial leases, 'kick out' clauses, generally, allow a tenant to terminate a lease before the expiration of the term *if the tenant fails to meet certain sales thresholds*." (emphasis added)); *Plaza 75 Shopping Ctr., LLC v. Big Lots Stores Inc.*, 485 F. App'x 855, 856 (9th Cir. 2012) (discussing a kickout provision that permitted termination during a certain time period if annual gross sales did not exceed a certain amount in a specific time frame).

Based on the plain language of paragraph 6(b) and the evidence offered by the parties, the Court concludes that paragraph 6(b)(i) is unambiguous and clearly requires that Tenant prosecute its applications for Governmental Authorizations to final determination before exercising its right to terminate under this provision. Accordingly, because the parties do not dispute that Speedway did not do so, Speedway did not have the right to terminate pursuant to paragraph 6(b)(i).

### ii.     *Termination Pursuant to Paragraph 6(b)(ii)*

Paragraph 6(b)(ii) of the Lease Agreement permits termination of the Lease Agreement within the Permit Period if Tenant "determines at any time that Governmental Authorizations will not be obtainable or can only be obtained at a cost which Tenant determines to be too high, or that development costs for the Station will be materially higher than Tenant had anticipated." As with paragraph 6(b)(i), termination under this provision is exercisable "prior to receipt of all Governmental Authorizations by Tenant." Defendants claim that Speedway's decision to terminate the Lease Agreement falls within this provision because Speedway determined that "the development costs for the proposed convenience store were materially higher than Speedway, the tenant, had anticipated (more specifically, a negative return on investment)." (Defs. Mov. Br. at 5). The Court finds that Defendants have failed to put forth sufficient evidence pertaining to materially high "development costs" to overcome Plaintiff's motion.

To start, the Court considers the parties' proposed definitions of "development costs." Lilac offers dictionary definitions of the words "development" and "costs" individually to posit that in this context "development costs" means "the amount or sum expended to make the Property suitable for commercial purposes—or, put more simply, the price to build the store":

> Merriam-Webster defines development as "the act, process, or result of developing. *Merriam-Webster Dictionary, available at* http://www.merriam-webster.com/dictionary/development. In the context of real property, develop means "to make suitable for commercial or residential purposes." *Merriam-Webster Dictionary, available at* http://www.merriam-webster.com/dictionary/develop. Cost is defined as "the amount or equivalent paid or charged for something," *i.e.*, the "price." *Merriam-Webster Dictionary, available at* http://www.merriam-webster.com/dictionary/cost; *see also Black's Law Dictionary* at 345 (6th ed. 1990) (defining cost as "sum or equivalent expended, paid or charged for something").

14

(Lilac Opp. Br. at 8). On the other hand, Lilac explains, "return on investment" means the "amount earned per year on an investment, usually expressed at a percentage." (*Id.* (quoting *Black's Law Dictionary* at 1318)). Based on the foregoing, Lilac says that a return on investment considers items beyond "development costs," including, *inter alia*, costs unrelated to "development" as well as potential earnings from the Property.

Defendants offer a broader definition of development costs. Defendants suggest that development costs "can include any associate costs for achieving the purpose of the Lease, constructing or developing a convenience store with fuel pumps to the Tenant's specifications. These costs can include, but are not limited to, preparing the application for governmental authorizations, application fees, designing a store, creating plans for a store, and **most importantly, the overall profitability of the store."** (Defs. Mov. Br. at 12–13 (emphasis added)). Based on this definition, Defendants argue that "[u]sing Speedway's return of investment criteria, it was clear that a negative return on investment; i.e. losing money over the life of the lease, equates to development costs that were clearly materially higher than anticipated." (*Id.* at 13).

Crucial to Defendants' argument is a premise that the Court cannot accept: that the anticipated profits of the store be considered as part of the development costs. Whatever the precise definition of "development costs," the phrase is certainly limited to "costs"—or the "amount paid or charged for something; price or expenditure." *Black's Law Dictionary* (11th ed. 2019). Profit, on the other hand, is "the excess of revenues over expenditures in a business transaction." *Id.* Thus, while the parties may reasonably dispute whether certain items—such as the cost of design plans, governmental authorizations and applications fees—can be properly

15

considered *development* costs, it is unreasonable to conclude that the phrase includes expected income or profits.

Having rejected Defendants' argument that "development costs" includes profits, Defendants' argument that they permissibly terminated the Lease Agreement under paragraph 6(b)(ii) must fail. The crux of Defendants' argument, and the evidence offered in support, is that because the ROI analysis projected a negative return (and one that fell below their internal standards), the development costs were necessarily higher than Speedway anticipated. But Defendants cannot rest on a comparison of Speedway's anticipated rate of return and the negative return projected by their ROI because, as Defendants' evidence makes clear, the ROI analysis considered factors beyond costs—*i.e.*, projected revenues. (*See* D.E. No. 66-7, Speedway Exhibit 17 at 20:7–21 (explaining that Speedway's ROI is calculated based on construction costs, some working capital that would be applied to the store, *operating income of the store*, depreciation, income taxes, and a lease penalty); *id.* at 38:16–39:8 (explaining that an ROI may be negative because of large initial cash outflows and relatively small inflows over the life of the asset)). Thus, even assuming "development costs" includes all of the costs that make up the cash outflows in the ROI, the ROI shows that the return was less than Speedway anticipated but does not necessarily mean that the development costs were materially higher than Speedway anticipated.[7] In other words, there is a gap in Defendants' argument that they never bridge: Speedway makes no attempt to isolate materially high development costs as the reason for the negative ROI. Without such

---

[7] Moreover, it is not clear that the Lease Agreement—which requires that the development costs be "materially higher than Tenant had anticipated"—contemplates comparing the projected development costs to Speedway's anticipated rate of return, rather than the development costs Hess anticipated when the parties entered the Lease Agreement. Lilac proffers that the Court should consider what was anticipated by Hess when the agreement was entered into. (Lilac Opp. Br. at 4). The Court need not resolve this issue because Speedway has not put forward evidence comparing the development costs to those anticipated by Hess at the time of the Lease Agreement, or to Speedway's internal expectations.

16

isolation, Defendants' argument depends on not only what the development costs are, but also what the projected income is. But it is the development costs specifically that gave Speedway a potential reason for termination under paragraph 6(b)(ii).

Thus, because "development costs" does not include profits and because Defendants do not put forth evidence (either in support of its motion or to rebut Lilac's motion) that development costs were materially higher than anticipated, Speedway has not shown that it was permitted to terminate the Lease Agreement under paragraph 6(b)(ii).[8]

In sum, Plaintiff has put forth sufficient evidence to support its interpretation of paragraph 6(b) and to demonstrate that, under the circumstances, Speedway was not permitted to terminate the Lease Agreement pursuant to either paragraph 6(b)(i) or (ii). Defendants have not put forward sufficient evidence to raise a genuine issue of material fact on these issues. Accordingly, Plaintiff is entitled to summary judgment as to Speedway's liability on the breach of contract claim.[9]

---

[8] As noted *supra,* another potential avenue for termination under paragraph 6(b)(ii) is if Tenant determined that Government Authorizations will not be obtainable. In passing, Defendants also argue that Speedway concluded that it would not be able to obtain Government Authorizations because the property was too small for its 3,900-square-foot store. (Defs. Opp. Br. at 4). In connection with this argument, Defendants emphasize that the Lease Agreement permitted Speedway to change the plans and specifications for the Station. As explained *supra*, however, Defendants did not have unfettered discretion to forego building a gas station on the Property altogether on the sole basis of changed plans and specifications. Thus, while Speedway did have the ability to modify the plans and specifications, that ability was qualified by the fact that Defendants ultimately had to construct, maintain, and operate a gas station on the Property, unless some other basis for termination existed. Thus, the fact that Speedway may not have been able to obtain Government Authorizations for a 3,900-square-foot store does not mean that such authorizations were unobtainable to build the required Station.

[9] Although Lilac initially states that it seeks summary judgment as to both Defendants' liability on the breach of contract claim (Lilac Mov. Br. at 1), Lilac elsewhere states that it seeks summary judgment as to Speedway's liability only, and Lilac's arguments do not address Hess's liability (*see id.* at 2, 7 & 14). Defendants did seemingly cross-move on this claim as to both Defendants, but the briefing does not specifically address Hess's potential liability, or lack thereof. Accordingly, the Court makes no determination on Hess's liability as to the breach of contract claim.

### B.     Breach of Good Faith and Fair Dealing

"Every party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 395 (N.J. 2005). "The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." *Id.* at 396 (quoting *Palisades Props., Inc. v. Brunetti*, 207 A.2d 522 (N.J. 1965)). Proof of "bad motive or intention" is essential to an action for breach of the covenant." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001). Importantly, the covenant of good faith and fair dealing involves an implied duty, and a breach of such implied covenants must differ from a literal violation of the contract. *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259 (N.J. 2002).

Defendants argue that Lilac does not have sufficient evidence of bad faith to overcome their motion for summary judgment. (Defs. Mov. Br. at 27–28). In response, Lilac argues that Speedway violated the breach of the covenant of good faith and fair dealing because the termination of the Lease Agreement was predicated on bad faith. (*See* Lilac Opp. Br. at 15). Essentially, Lilac argues that Speedway acted in bad faith because it acquired the Lease Agreement and never intended to hold up Hess's end of the bargain. In support, Lilac relies on the following facts: (i) Speedway did not review the Lease Agreement prior to the acquisition; (ii) Speedway admitted that it never intended to build any Hess legacy stores, or stores that were less than 3,900 square feet; and (iii) as of October 3, 2018, Speedway had not constructed any stores in New Jersey and had no plan to do so. (*Id.* (citing Lilac SUMF ¶¶ 25–26 & 46–47)). Even assuming Lilac's evidence is entirely undisputed, it is not enough to survive summary judgment on this claim.

18

Lilac's claim boils down to an argument that Speedway terminated the agreement in breach of the contract and that such termination itself constituted a breach of the covenant of good faith and fair dealing. But a claim for breach of the implied covenant cannot be based on the same alleged breach that forms the basis of the breach of contract claim. *Wade*, 798 A.2d at 1261; *Aequus Techs., L.L.C. v. gh, L.L.C.*, No. 03-5139, 2011 WL 1211328, at *4 (D.N.J. Mar. 29, 2011). And here, Lilac does not put forward any evidence of conduct—unrelated to the ultimate termination of the agreement—that could form the basis of a claim for breach of the implied covenant of good faith and fair dealing that is separate from its claim for breach of contract.

Accordingly, the Court finds that Defendants are entitled to summary judgment on this claim.

### IV.  CONCLUSION[10]

For the foregoing reasons, Lilac's motion for summary judgment on Speedway's liability for breach of contract is GRANTED. Defendants' motion for summary judgment is DENIED as to the breach of contract claim and GRANTED as to Lilac's claim for breach of the covenant of good faith and fair dealing. An appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

---

[10] Lilac also brought a claim for promissory estoppel. (Complaint ¶¶ 65–69). This claim appears duplicative of the breach of contract claim, but because the parties do not address it the Court does not address it either.